# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

DOUGLAS W. HIGGINS,

              Plaintiff,

        v.                        Case No. 21-CV-1021

TRU SERVICE GROUP, INC.,

              Defendant.

## DECISION AND ORDER

### 1.      Procedural History

Plaintiff Douglas Higgins filed a complaint in South Carolina state court, naming as defendants his former employer, Tru Service Group, Inc. ("Tru Service"), Catalyst Exhibits, Inc. ("Catalyst"), Tru Service's and Catalyst's part-owner and President, Tim Roberts, and Tru Service's part-owner and General Manager, Dave Larsen. (ECF No. 1-1 at ¶¶ 8-11.) The complaint alleged against all four defendants claims for breach of contract, fraud in the inducement, negligent misrepresentation, and promissory estoppel. (ECF No. 1-1 at ¶¶ 57-83.)

The defendants removed the case to the United States District Court for the District of South Carolina on diversity jurisdiction grounds. (ECF No. 1 at ¶¶ 4-17.) After doing

so the defendants filed a motion to dismiss Higgins's complaint for lack of jurisdiction or, alternatively, to transfer the case to the Eastern District of Wisconsin. (ECF No. 9.) The court entered an order transferring the case to this court. (ECF No. 14 at 11-12.)

Once in this court the defendants filed a motion to dismiss Higgins's complaint for failure to state a claim on which relief can be granted. (ECF No. 21.) Only Higgins's claim for breach of contract against Tru Service survived that motion—all other claims and parties were dismissed. (ECF No. 31 at 21.) Following a scheduling conference, Higgins filed an amended complaint, seeking to reintroduce Roberts as a defendant and reassert claims for fraud in the inducement, negligent misrepresentation, and promissory estoppel. (ECF No. 34.) When Roberts and Tru Service filed a motion to dismiss the amended complaint, Higgins agreed to dismiss Roberts as a defendant and all other claims apart from his breach of contract claim against Tru Service. (ECF No. 38.)

Higgins has now moved for summary judgment on his breach of contract claim against Tru Service. (ECF Nos. 73.) Tru Service also has moved for summary judgment on Higgins's breach of contract claim, as well as on certain issues relating to Higgins's potential damages recovery. (ECF No. 69.) Both motions are fully briefed and ready for resolution.

## 2.    Facts

Tru Service, headquartered in Pleasant Prairie, Wisconsin, installs and dismantles trade show and convention exhibits. (ECF Nos. 37 at ¶ 6.) Tim Roberts, Paul Stahlberg,

Rich Korth, and Dave Larsen are the owners of Tru Service. (ECF Nos. 78-2 at 11:16-23; 87 at ¶ 1.) Roberts is Tru Service's President and Larsen is its General Manager. (ECF No. 103 at ¶ 16.)

Higgins began working in the trade show installation and dismantling industry in 1987 when he joined a company called Nth Degree. (ECF No. 103 at ¶ 6.) Like Tru Service, Nth Degree provides exhibit installation and dismantling services for trade shows, conventions, and other events. (ECF No. 103 at ¶ 7.) While a competitor of Tru Service, Nth Degree is significantly larger and operates throughout North America and Europe. (ECF Nos. 103 at ¶ 9; 37 at ¶ 17.) As a Senior Account Executive at Nth Degree, Higgins sold installation and dismantling services to companies presenting exhibits at trade shows and private events. (ECF No. 103 at ¶ 10.) A significant part of Higgins's job at Nth Degree involved attending trade shows to generate new business and meet with current clients. (ECF No. 103 at ¶¶ 12-13.) While at Nth Degree, Higgins was responsible for servicing over 100 clients. (ECF No. 103 at ¶ 15.) Higgins was one of Nth Degree's top salespeople during his time with the company. (ECF No. 71-2 at 8:12-9:1.)

In early 2018 Roberts approached Higgins to propose that he come to work for Tru Service. (ECF Nos. 37 at ¶ 22; 78-2 at 11:16-19, 12:7-9; 67 at 12:21-24; 71-2 at 8:12-14.) Higgins told Roberts that he did not intend to leave Nth Degree. (ECF No. 37 at ¶ 23.) Nonetheless, Roberts and Larsen continued to recruit Higgins, inviting him to meals at

upscale restaurants in Chicago and Atlanta. (ECF No. 78-2 at 28:15-29:4, 68 at 12:21-19:25; 37 at ¶ 25.)

Sometime during Tru Service's recruitment efforts Higgins told Larsen and Roberts that he had a "book of business" in excess of $5 million. (ECF No. 103 at ¶ 16.) According to Roberts and Larsen, Higgins also boasted that, if he did decide to leave Nth Degree, he could bring over 80 to 90 percent of his book of business "right away," which Roberts and Higgins construed to mean within "essentially three to eight months." (ECF Nos. 78-2 at 46:2-47:23; 78-6 at 36:19-22.) Higgins claims he never made such a representation. (ECF No. 103 at ¶ 17.)

In early January 2019 Roberts, Larsen, and Korth flew to Atlanta with plans to meet with Higgins and finalize his move to Tru Service. (ECF Nos. 67 at 17:6-19:25; 78-2 at 42:1-3; 37 at ¶ 28.) In Atlanta, the Tru Service owners took Higgins to dinner (ECF Nos. 71-2 at 99:20-100:4; 103 at ¶ 18), during which Higgins represented that he would need an offer north of $250,000 for "a minimum of two years" to consider leaving Nth Degree for Tru Service. (ECF No. 103 at ¶ 19.)

As Higgins describes it, Tru Service's owners initially offered him a one-year deal at $250,000, to which he responded that he would "need a little bit more than $250,000" and a minimum of two years. (ECF No. 71-2 at 100:18-101:3.) He claims that Tru Service's owners, "without batting an eye," agreed to two years at $275,000 and said that "they would have a letter to [him] the following week with a contract." (ECF No. 71-2 at 100:18-

101:3.) Though unsure, Larsen acknowledges that Tru Service might have started negotiations at $250,000. (ECF No. 71-4 at 100:1-9.) Larsen testified that Tru Service eventually agreed to the $275,000 figure because it is five percent (the standard rate of commission for salespeople working in the tradeshow installation and dismantling business) of $5,500,000 (what Higgins approximated as his "book of business" at Nth Degree). (ECF Nos. 103 at ¶ 20; 78-6 at 11:24-12:13, 12:2-24, 19:11-21:5.)

A few days after the Atlanta dinner, on January 7, 2019, Tru Service's Director of Human Resources, Amanda Hanna, emailed Higgins a letter offering him an Account Executive position with Tru Service (the "Offer Letter"). (ECF No. 78-3 at 1.) Hanna testified that she drafted the letter based on the job title, salary, and compensation information given to her by Larsen and Roberts. (ECF No. 80-2 at 16:1-18:5.) She also explained that she sent her draft of the letter to Larsen and Roberts for their review before sending it to Higgins and that she would not have sent the letter to Higgins without first receiving their approval. (ECF No. 80-2 at 37:17-38:11.)

Under the heading "Compensation" the Offer Letter provided:

> You will be paid a non-recoverable draw in the amount of $275,000 guaranteed for 2 years. You will also be paid a 5% commission; the commission will be paid after the draw has been met. After two years you will receive (sic) be responsible for covering your draw, and it will no longer be guaranteed.

(ECF No. 78-3 at 1.) The term "non-recoverable draw" in the Offer Letter means that Tru Service could not recoup from Higgins any portion of the draw in the event Higgins's

sales production did not meet the level upon which the nonrecoverable draw was calculated. (ECF No. 103 at ¶ 26.)

In his deposition testimony Larsen offered insight into why Tru Service offered Higgins a nonrecoverable draw. (ECF No. 78-6.) Larsen testified that Higgins wanted a nonrecoverable draw "north of $250,000" because, "in order to get all his business over … it would take possibly two years." (ECF No. 78-6 at 11:4-12:13.) Tru Service rarely, if ever, offered prospective employees nonrecoverable draws. (ECF No. 78-6 at 12:14-26.) In Higgins's case, however, "[t]he [parties'] understanding was that … it would take [Higgins] two years to bring his entire book of business over [to Tru Service]," and, therefore, he needed time "to cover his draw." (ECF No. 78-6 at 12:14-26, 19:19-20:7.) Accordingly, Tru Service offered Higgins "a nonrecoverable draw for two years, so that he could meet that commission" without having to worry about producing less than $5.5 million in either of his first two years. (ECF No. 78-6 at 20:5-7.)

Higgins told Roberts that he would need some time to consider the offer. (ECF No. 87 at ¶ 8.) In June 2019 Roberts told Higgins that the terms of the Offer Letter would expire in July. (ECF No. 87 at ¶ 9.) In early July 2019 Higgins notified Roberts that he accepted the Offer Letter's terms, and, on July 10, 2019, Higgins began working for Tru Service. (ECF No. 103 at ¶ 22.) On July 16, 2019, upon Tru Service's request, Higgins emailed the signed Offer Letter to Human Resources Manager Megan Hindrum. (ECF No. 92 at ¶ 2.)

Higgins's Offer Letter did not set forth what his duties as a Senior Account Executive would be. (ECF No. 78-3 at 1.) However, the parties agree that Higgins's duties included: creating a book of business; managing and growing accounts, the number of accounts, and revenue; prospecting for new clients and generating new business opportunities with new clients; and developing and actively pursuing a list of targeted accounts and creating plans to get those accounts. (ECF No. 103 at ¶ 33.) Going to trade shows was also an important aspect of Higgins's job, as they presented opportunities to meet prospective clients and generate new business. (ECF No. 103 at ¶¶ 12-13, 48.) But Higgins only attended two trade shows on behalf of Tru Service during his eight months with the company. (ECF No. 103 at ¶ 62.)

The Radiological Society of North America ("RSNA") trade show was the world's largest medical trade show and the biggest trade show of the year for Siemens, Higgins's largest client when he was with Nth Degree. (ECF No. 103 at ¶¶ 53-54.) RSNA was the most important show of the year for Higgins during his time with Nth Degree. (ECF No. 103 at ¶ 54.) Siemens had the largest booth at the RSNA trade show in 2019, amounting to a $700,000-$800,000 installation and dismantle job. (ECF No. 103 at ¶ 52.) But in 2019, for the first time in over 30 years, Higgins did not attend the RSNA show. (ECF No. 103 at ¶ 57.)

While Tru Service claims that it expected Higgins to attend the RSNA show because of its interest in acquiring Siemen's business, Higgins testified that he told Larsen

that he was not going to attend RSNA because he didn't "have any business at that show and [he] knew it was not a big-time selling show because everybody is so focused on what they're doing." (ECF No. 103 at ¶ 58.) Higgins also testified that Larsen did not voice any objection to him missing the RSNA show, nor did Larsen ever express dissatisfaction with his job performance. (ECF No. 103 at ¶¶ 58, 68.) Larsen testified that he did not think Higgins was making a genuine effort to secure new business for Tru Service, and he found Higgins's absence from the RSNA show—and his overall job performance— "unacceptable." (ECF No. 103 at ¶ 68.)

During his employment with Tru Service Higgins secured a total of five clients who agreed to have Tru Service provide labor for two trade shows. (ECF No. 103 at ¶ 44.) While this new business produced $72,856.32 in revenue for Tru Service—generating a profit of roughly $25,000—Tru Service paid Higgins a total of $185,000 in accordance with the compensation terms set forth in the Offer Letter. (ECF No. 103 at ¶¶ 62-65.)

The COVID-19 pandemic quickly devastated the trade show industry. (ECF No. 103 at ¶ 78.) By March 2020 all trade shows scheduled for the 2020 calendar year were canceled. (ECF No. 103 at ¶ 69.) On March 5, 2020, Tru Service decided to terminate Higgins's employment because he was the company's highest paid employee, he did not have any clients with Tru Service, and there was no trade show work left for him to secure for the remainder of 2020. (ECF No. 103 at ¶ 71.) Tru Service told Higgins his termination

was due to shows being canceled in response to the COVID-19 pandemic and did not indicate that his termination was related to his performance. (ECF No. 103 at ¶¶ 72, 77.)

After his termination by Tru Service Higgins started working part-time with the food delivery service DoorDash. (ECF No. 103 at ¶ 84.) He made $6,674.22 working for DoorDash in 2020 and $1,495.02 in 2021, for a total of $8,169.24. (ECF No. 103 at ¶ 85.) Higgins also received $22,158 in unemployment compensation in 2020 following his termination. (ECF No. 103 at ¶ 88.)

Higgins stopped working for DoorDash in April 2021 when he started work as an account executive with Eagle Management Group, a company operating in the same trade show installation and dismantling industry as Nth Degree and Tru Service. (ECF No. 103 at ¶ 86.) From the time he began working for Eagle Management until July 10, 2021 (two years from the day his employment with Tru Service began), Higgins made $46,800, $40,000 of which was a lump sum paid out from a Paycheck Protection Program (PPP) loan received by Eagle Management. (ECF No. 103 at ¶ 87.)

Higgins seeks $367,000.00 in backpay for his breach of contract claim, which was the amount remaining on his two-year employment agreement with Tru Service as of the date he was terminated. (ECF No. 103 at ¶ 89.) Higgins also seeks damages for out-of-pocket medical costs, $2,500 for out-of-pocket medical bills, and the costs for dental and vision insurance, as well as damages for the difference between what he was making at Nth Degree ($200,000.00) before Tru Service hired him and what he was making at Eagle

Management Group ($60,000.00). (ECF No. 103 at ¶¶ 90-91.) While unclear, Higgins's complaint also appears to seek punitive damages. (ECF No. 34 at 10.)

3. **Summary Judgment Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016).

4. **Analysis**

The parties agree that Wisconsin law governs Higgins's breach of contract claim. (ECF Nos. 70 at 2 & n.2; 84 at 3-9.) In Wisconsin, "[a] claim for breach of contract has three elements: (1) an enforceable contract between the parties; (2) a breach of the contract; and (3) damages." *Saft Am., Inc. v. Precision Drawn Metals, Inc.*, No. 21-cv-35, 2022 WL 3444883,

at \*2 (W.D. Wis. Aug. 17, 2022) (citing *Kaste v. Amery Reg'l Med. Ctr., Inc.*, 2016 WI App 75, ¶ 9, 371 Wis. 2d 759, 886 N.W.2d 592). In moving for summary judgment, Higgins contends that the January 2019 Offer Letter was a binding and enforceable contract guaranteeing him two years of employment with an annual salary of $275,000, that Tru Service breached the terms of the two-year contract when it terminated him, and that Tru Service's breach caused him damages. (ECF Nos. 84 at 2-4; 34 at ¶¶ 61-66.)

### 4.1. Employee At Will

Tru Service argues that Higgins's breach of contract claim fails as a matter of law because Higgins was an employee at will, terminable at any time and for any reason, with or without cause. (ECF Nos. 70 at 2-7; 86 at 6-10.) Higgins argues that Tru Service's contention that he was an employee at will is an "affirmative defense" which Tru Service waived by failing to raise it in its answer. (ECF Nos. 89 at 2-3; 84 at 6-7.) Higgins does not offer any authority to support that argument. (ECF No. 89 at 2-3.)

A defense is properly construed as an affirmative defense under Federal Rule of Civil Procedure 8(c)(1) when "it … defeat[s] liability even where the plaintiff proves his case." *See Burford v. Accounting Pract. Series, Inc.*, No. 12-cv-1212, 2014 WL 2974064, at \*2 (S.D. Ill. July 1, 2014) (citing *Instituto Nacional De Comercializacion Agricola (Indeca) v. Continental Ill. Nat'l Bank & Trust Co.*, 576 F. Supp. 985, 988 (N.D. Ill. 1983)); *see also Winforge, Inc. v. Coachmen Indus., Inc.*, 691 F.3d 856, 872 (7th Cir. 2012) ("If … the defense

does not controvert the plaintiff's case, it is an affirmative defense." (internal citation omitted)).

Tru Service's employee-at-will argument controverts an element essential to Higgins's breach of contract claim—specifically, that the parties had a binding and enforceable two-year employment contract. In other words, Tru Service's employee-at-will argument and Higgins's claim for breach of contract are mutually exclusive—either Higgins was an employee at will, terminable at any time and for any reason, *or* he had a guaranteed two-year contract. As such, Tru Service's argument that Higgins was an employee-at-will is not an affirmative defense pursuant to Federal Rule of Civil Procedure 8(c)(1). *Burford*, 2014 WL 2974064, at *2; *Winforge, Inc.*, 691 F.3d at 872.

Under Wisconsin law, an employee hired for an indefinite term is presumed to be an employee at will. *See Brown v. Pick 'N Save Food Stores*, 138 F. Supp. 2d 1133, 1138 (E.D. Wis. 2001) (citing *Brockmeyer v. Dun & Bradstreet*, 113 Wis. 2d 561, 567, 335 N.W.2d 834, 837 (1983)); *see also Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 269 (7th Cir. 1995) ("Wisconsin has a strong presumption in favor of employment at-will" (citing *Forrer v. Sears, Roebuck & Co.*, 36 Wis. 2d 388, 393 153 N.W.2d 587, 589-90 (1967))). And, in Wisconsin, "at-will employees are terminable at will, for any reason, without cause and with no judicial remedy." *Kvapil v. Chippewa Cnty., Wis.*, 752 F3d 708, 713 (7th Cir. 2014) (quoting *Bammert v. Don's Super Valu, Inc.*, 254 Wis. 2d 347, 646 N.W.2d 365, 368 (Wis. 2002)). *But see Brockmeyer*, 113 Wis. 2d at 573, 335 N.W.2d at 840 (providing an exception

to the rule that at-will employees are terminable at will where the employee's discharge is "contrary to a fundamental and well-defined public policy as evidenced by existing law"). The presumption in Wisconsin that an employee is an employee at will, however, is overcome where "the terms of [a] contract or other circumstances clearly manifest the parties' intent to bind each other." *Forrer*, 36 Wis. 2d at 393, 153 N.W.2d at 589-90; *see also Derozier v. Walgreen Co.*, No. 09-C-100, 2010 WL 1905015, at *2 (E.D. Wis. May 11, 2010) ("By entering into an express contract with the employer, an employee's at-will status may be abrogated.").

Under Wisconsin law, a court's "primary goal in contract interpretation is to 'give effect to the parties' intent, as expressed in the contractual language.'" *Maryland Arms Ltd. P'ship v. Connell*, 2010 WI 64, ¶ 22, 326 Wis. 2d 300, 311, 786 N.W.2d 15, 20 (quoting *Seitzinger v. Cmty. Health Network*, 2004 WI 28, ¶ 22, 270 Wis. 2d 1, 14, 676 N.W.2d 426, 433). The court must "interpret the language 'consistent with what a reasonable person would understand the words to mean under the circumstances.'" *Id.* (quoting *Seitzinger*, 2004 WI 1, ¶ 22, 270 Wis. 2d at 14, 676 N.W.2d at 433). "Where the terms of a contract are clear and unambiguous, [the court must] construe the contract according to its literal terms," *id.* at ¶ 23, 326 Wis. 2d at 311, 786 N.W.2d at 20-21 (quoting *Gorton v. Hostak, Henzl & Bichler, S.C.*, 217 Wis. 2d 493, 506, 577 N.W.2d 617, 623 (1998)), and the court may not consider extrinsic evidence. *Town Bank v. City Real Estate Dev., LLC*, 2010 WI 134, ¶ 33, 330 Wis. 2d 340, 356, 793 N.W.2d 476, 484. But "when the contract is ambiguous, … the court

Case 2:21-cv-01021-WED   Filed 03/29/23   Page 13 of 30   Document 109

[may] look beyond the face of the contract and consider extrinsic evidence to resolve the parties' intent." *Id.* (citing *Cap. Invs., Inc. v. Whitehall Packing Co.*, 91 Wis. 2d 178, 190, 280 N.W.2d 254, 259 (1979)). "A contract provision is ambiguous if it is fairly susceptible of more than one construction." *Tufail v. Midwest Hosp., LLC*, 2013 WI 62, ¶ 27, 348 Wis. 2d 631, 643, 833 N.W.2d 586, 592 (quoting *Mgmt. Comput. Servs., Inc. v. Hawkings, Ash, Baptie & Co.*, 206 Wis. 2d 158, 177, 557 N.W.2d 67, 75 (1996)).

Higgins argues that the Offer Letter unambiguously guaranteed him a binding two-year employment contract with an annual salary of $275,000. (ECF No. 84 at 3-4.) Tru Service argues that the sentence, "After two years you will … be responsible for covering your draw, and it will no longer be guaranteed" clarifies "that the word 'guaranteed' only modifies the type of draw" and does not refer to any definite term of employment. (ECF No. 70 at 4.)

It is undisputed that "guaranteed" modifies the type of draw and, thus, guarantees two years of a "non-recoverable draw in the amount of $275,000." It is also clear that the sentence Tru Service relies on reinforces that understanding. But the sentence does not negate the unambiguous guarantee of two years' employment. If anything, explaining that "[a]fter two years, you will … be responsible for covering your draw" underscores the understanding that the Offer Letter establishes a two-year contract.

Tru Service principally relies on an unpublished New Hampshire district court decision, *Gately v. Mortara Instrument, Inc.*, No. 17-cv-100, 2017 WL 3431964 (D.N.H. Aug.

9, 2017), to support its construction. *Gately* involved an employment offer letter with the following provision:

> In this role, your annual base salary will be $150,000, with a commission plan designed to generate variable compensation of $100,000 annually, which will be guaranteed for the initial twelve months of your employment by means of a non-recoverable monthly draw. For months 13-24, your variable compensation plan, again targeted to achieve $100,000 on an annual basis, will be paid to you by means of a monthly recoverable draw.

*Id.* at *2. The plaintiff argued that this provision "establish[ed] a 24-month employment term" by guaranteeing him certain "variable compensation … for the initial twelve months of [his] employment," and that, "[f]or months 13-24," the "variable compensation plan" would be paid "by means of a monthly recoverable draw." *Id.* at *4. The court disagreed, finding that provision only guaranteed the employee a certain type of payment if he remained employed and did not guarantee a definite term of employment. *Id.* at *5-6.

Although the court does not believe that the provision disputed in that case guaranteed the plaintiff two years of employment as the plaintiff argued, it did seemingly guarantee the plaintiff variable compensation of $100,000 for one year. In any event, the decision is non-binding on this court and the court finds it unpersuasive.

Tru Service cites several other cases for the proposition that "[t]he terms in an employment agreement regarding compensation are separate from a term of duration for the employment." (ECF No. 70 at 3 (citing *Buian v. J.L. Jacobs & Co.*, 428 F.2d 531 (7th Cir. 1970); *Woodward v. BBT Sec., LLC*, No. 16-cv-1801, 2018 WL 3622925 (N.D. Ala. July 30,

2018); *Mann v. Ben Tire Distribs., Ltd.*, 89 Ill. App. 3d 695, 411 N.E.2d 1235 (Ill. App. Ct. 1980)).) None of those decisions, however, provide rules of law which bind this court's interpretation of contractual language under Wisconsin law. *See Buian*, 428 F.2d 531 (applying Illinois law); *Mann*, 89 Ill. App. 3d 695, 411 N.E.2d 1235 (applying Illinois law); *Woodward*, 2018 WL 3622925 (applying Alabama law). Moreover, the fact that a contractual term guaranteeing a certain duration of employment appears under the heading "Compensation" does not nullify the term's guarantee of a definite term of employment. *Cf. O'Leary v. Sterling Extruder Corp.*, 533 F. Supp. 1205, 1208 (E.D. Wis. 1982) (recognizing that the "appearance of the disputed term under the heading 'base salary' suggests that the term is a salary term or that its meaning should be ascertained with salary in mind" but concluding that the term was reasonably understood to establish a definite term of employment). Therefore, the fact that the term which guarantees Higgins two years' employment appears under the heading "Compensation" does not nullify that guarantee.

The Offer Letter's term "You will be paid a non-recoverable draw in the amount of $275,000 guaranteed for 2 years" is an unambiguous guarantee of two years' employment with a $275,000 nonrecoverable draw for that period. Therefore, Tru Service's motion for summary judgment will be denied as it relates to Higgins's breach of contract claim.

### 4.2. Just Cause for Termination

Tru Service argues that, "[e]ven if the court finds the Offer Letter was for a specified two-year term …, the court should nevertheless deny [Higgins summary judgment on his breach of contract claim] because there is a genuine issue of material fact as to whether [Higgins] was terminated for 'just cause.'" (ECF No. 86 at 10.)

Higgins argues that Tru Service's just-cause argument is an "affirmative defense" pursuant to Federal Rule of Civil Procedure 8(c)(1). (ECF Nos. 89 at 1-3; 89 at 4-5.) But, again, Higgins does not cite any authority to support his argument. (ECF Nos. 89 at 1-3; 89 at 4-5.) And Tru Service's just-cause argument, like its employee-at-will argument, controverts an element essential to Higgins's breach of contract claim—specifically, that Tru Service breached Higgins's two-year contract when it terminated his employment after eight months. As such, Tru Service's argument that Higgins was terminated for just cause is not an affirmative defense pursuant to Federal Rule of Civil Procedure 8(c)(1). *Burford*, 2014 WL 2974064, at *2; *Winforge, Inc.*, 691 F.3d at 872.

Under Wisconsin law, when a contract establishes a fixed term of employment, "the employer has the burden of proving that the employee was discharged for cause, where the employer relies on such a discharge as a ground for terminating the contract prior to its expiration date in the absence of any special provision in the contract providing to the contrary." *Johnson v. Green Bay Packers, Inc.*, 272 Wis. 2d 149, 160-61, 74 N.W.2d 784, 790 (1956) (citing *Boynton Cab Co. v. Giese*, 237 Wis. 237, 243, 296 N.W. 630,

634 (1941)). "What constitutes sufficient ground for discharging an employ[ee] is a matter of law unless provided for in the contract of employment; but where the facts are in dispute the case, under proper instructions, should be submitted to the jury." *Thomas v. Beaver Dam Mfg. Co.*, 157 Wis. 427, 429, 147 N.W. 364, 366 (1914). In Wisconsin, "neglect of duty of a substantial character … constitutes good ground for discharging the employ[ee]." *Id.* at 429, 147 N.W. at 366; *see also Ramirez v. Pia*, No. 11-C-754, 2013 WL 950961, at *6 (E.D. Wis. Mar. 12, 2013) ("An employee's failure to perform his duties is … good cause for termination of employment." (citing *Millar v. Joint Sch. Dist. No. 2*, 2 W.s 2d 303, 312, 86 N.W.2d 455, 460 (1957)).

The Offer Letter did not set forth what Higgins's duties as a Senior Account Executive with Tru Service would be. However, the parties agree that Higgins's duties included: creating a book of business; managing and growing accounts, the number of accounts, and revenue; prospecting for new clients and generating new business opportunities with new clients; and developing and actively pursuing a list of targeted accounts and creating plans to get those accounts. (ECF No. 103 at ¶ 33.) Tru Service argues that Higgins's failure to secure new clients and his lack of effort in pursuing prospective clients amounted to a failure to perform his duties, providing just cause for his termination. (ECF No. 86 at 11 (citing ECF No. 103 at ¶¶ 16, 33, 35, 38, 41-44, 48, 58, 60, 65-66, 68).) Tru Service argues that this is especially so, given Higgins's representation

that he had a book of business of more than $5 million at Nth Degree. (ECF No. 86 at 11 (citing ECF No. 103 at ¶ 16).)

Higgins's representation about his book of business clearly fueled Tru Service's efforts to recruit him and informed the favorable terms in the Offer Letter (ECF No. 103 at ¶ 20). But it is disputed whether Higgins ever assured Tru Service that he would bring a certain portion of his book of business to Tru Service, or that he would do so within a specified timeframe. (ECF No. 103 at ¶ 17.) While Larsen testified that Higgins, in conversations leading up the Offer Letter, said that "he had between 5 and 6 million dollars' worth of business and that he could bring a bunch of it right away" (ECF No. 71-4 at 15:20-22), and Roberts testified that Higgins told them that he could bring "80 to 90 percent of his business … over right away" (ECF No. 78-2 at 46:4-13), Higgins testified that he never made any such promises about which clients he would bring over and how quickly he would do so (ECF No. 71-2 at 248:7-11), and that he had specifically asked Tru Service for two years' employment "[b]ecause [he] knew that one year was … going to be up and gone very quickly, and to bring over the business that they were looking [for him] to bring over [he] knew it was going to take two years" (ECF No. 71-2 at 265:13-19).

If Roberts's and Larsen's testimony is credited, Tru Service's argument that it had just cause to terminate Higgins is strengthened. But if Higgins's testimony is credited, Tru Service's just-cause argument is weakened. Whether Higgins made such assurances

is genuinely disputed and bears on the issue of whether his failure to secure new clients for Tru Service during his first eight months constituted just cause for his termination.

Tru Service also argues that Higgins's "lack of effort in pursuing clients" constituted just cause for his termination. But whether Higgins did in fact display a "lack of effort in pursuing clients" during his eight months with Tru Service is also genuinely disputed. As evidence of his lack of effort, Larsen testified that Higgins, in his first months with the company, was not asking him for help with estimates or about what rates he could offer potential clients. (ECF No. 103 at ¶ 35.) But Higgins testified that he consistently communicated with Larsen during his time with the company, and that Larsen was particularly involved when Higgins was putting together estimated rates for potential clients. (ECF No. 103 at ¶ 35.) Tru Service also contends that Higgins only emailed 36 potential customers on behalf of Tru Service during his eight months with the company, and that Higgins did not contact all of his former clients at Nth Degree. (ECF No. 103 at ¶¶ 38, 41.) Higgins, however, testified that he sent more emails than Tru Service is giving him credit for. (ECF No. 103 at ¶ 38.) And while he concedes that he did not contact all of his former clients at Nth Degree, he testified that he reached out to all of the "bigger ones that represented bigger dollars," and did not reach out to the smaller clients because he was uncertain whether they were still attending trade shows. (ECF No. 103 at ¶ 41.) The court cannot determine from this conflicting testimony whether Higgins displayed a genuine lack of effort in pursuing prospective clients during his time with

Tru Service, let alone that he neglected his duty enough to constitute just cause for his termination.

The import of Higgins's absence from the RSNA trade show is also disputed and bears on Higgins's effort—or lack thereof—in pursuing prospective clients. Tru Service claims that it expected Higgins to attend the show and construed his absence as a lack of effort in pursuing clients—including Siemens, whose business Tru Service coveted. (ECF No. 103 at ¶¶ 58-60.) Larsen testified that Higgins's failure to attend the RSNA trade show constituted an unacceptable lack of effort on Higgins's part in attempting to secure new business. (ECF No. 103 at ¶ 68.)

But Higgins disputes Tru Service's claim that his absence from the RSNA trade show was indicative of a lack of effort in pursuing prospective clients. Higgins testified that he told Larsen he was not going to attend the show because he didn't "have any business at that show and [he] knew it was not a big-time selling show because everybody is so focused on what they're doing." (ECF No. 103 at ¶ 58.) Higgins also testified that Larsen did not voice any objection to him missing the RSNA show, nor did Larsen ever express any dissatisfaction—in writing or otherwise—with his job performance. (ECF No. 103 at ¶¶ 58, 68.) As such, a genuine dispute of material fact exists as to whether Higgins's failure to attend the RSNA show signaled a lack of effort in pursuing prospective clients sufficient to constitute just cause for his termination.

Tru Service also argues that "[t]he unprecedented time during the Pandemic for Tru Service and the trade show industry also constitutes just cause as [it] had to … take drastic cost-cutting measures to survive the significant downturn in business." (ECF No. 86 at 11.) It is undisputed that the COVID-19 pandemic had a devastating impact on the trade show installation and dismantling business, which in turn influenced Tru Service's decision to terminate Higgins. (ECF No. 103 at ¶¶ 71, 78.) But Tru Service does not provide any authority to suggest that, under Wisconsin law, a significant downturn in business—caused by a pandemic or otherwise—constitutes just cause for terminating an employee before his term of guaranteed employment expires. (ECF No. 86 at 11-12.) And while Tru Service claims that Higgins, by signing its Employee Handbook acknowledgment, recognized that he was an at-will employee who could be terminated when doing so served Tru Service's "best interest," it has already been established that Higgins had a two-year employment contract and, therefore, was not an at-will employee. (ECF No. 86 at 11-12.)

Because the issue of whether Tru Service breached Higgins's two-year contract is for the factfinder—and not this court on summary judgment—Higgins's motion for summary judgment on his breach of contract claim will be denied.

### 4.3. Damages

Both parties have also moved for summary judgment on certain issues relating to damages.

### 4.3.1. Mitigation Offset

Tru Service claims that it is "entitled to a set-off of $77,127.24 for any recovery by [Higgins] in the amount of money earned by [him] working for DoorDash and Eagle Management Group up until July 2021 (when [Higgins's] contract would have been up under his theory of the case) as well as his unemployment benefits." (ECF No. 93 at 10.)

In Wisconsin, a party alleging a breach of contract is obliged "to use reasonable means under the circumstances to avoid or minimize the damages." *Peterson v. Cornerstone Prop. Dev., LLC*, 2006 WI App 132, ¶ 53, 294 Wis. 2d 800, 830, 720 N.W.2d 716, 731 (quoting *Kramer v. Bd. of Educ. of the Sch. Dist. of the Menomonie Area*, 2001 WI App 244, ¶ 13, 248 Wis. 2d 333, 341 635 N.W.2d 857, 861). It is also "well established that a party is not entitled to be placed in a better position because of a breach than he or she would have if the contract had been performed." *Kramer*, 2001 WI App 244, ¶ 13, 248 Wis. 2d at 341-42, 635 N.W.2d at 861 (citing *Hanz Trucking, Inc. v. Harris Bros.*, 29 Wis. 2d 254, 268, 138 N.W.2d 238, 246 (1965)). Accordingly, "a discharged employee has a duty to seek other employment, and … the employer has the right to a credit to the extent the employee obtains work and earns wages." *Unico, Inc. v. Acton St. Corp.*, 888 F. Supp. 103, 105 (E.D. Wis. 1995) (quoting *State ex rel. Schilling v. Baird*, 65 Wis. 2d 394, 401, 222 N.W.2d 666, 670 (1974)). Moreover, "an employer is entitled to deduct unemployment benefits from backpay damages." *Id.* (citing *Dehnart v. Waukesha Brewing Co.*, 21 Wis. 2d 583, 595-96, 124 N.W.2d 664 (1963)).

Higgins asks the court to "use its discretion and not offset [his] unemployment benefits and PPP money against his damages." (ECF No. 89 at 6.) To support his assertion that it is within this court's discretion to do so, Higgins cites to federal cases which—in determining what damages a plaintiff is entitled to under certain federal statues—invoke the collateral source rule, the purpose of which "is not to prevent the plaintiff from being overcompensated but rather to prevent the *tortfeasor* from paying twice." (ECF No. 89 at 6 (quoting *Perry v. Larson*, 794 F.2d 279, 286 (7th Cir. 1986) (emphasis added)).) But because this is a common law breach of contract case and Tru Service is not alleged to be a tortfeasor (let alone a tortfeasor in violation of a federal statute), Higgins's reliance on the collateral source rule is misplaced. *See Fischer v. Steffen*, 2011 WI 34, ¶ 30, 333 Wis. 2d 503, 513-14, 797 N.W.2d 501, 506 ("In general, the collateral source rule provides that a *tortfeasor's* liability to an injured person is not reduced because the injured person receives funds from other sources. The collateral source rule prevents payments made by the injured party, such as premiums paid for an insurance policy, from inuring to the benefit of the *tortfeasor*." (emphasis added) (footnotes omitted)).

After his March 5, 2020, termination but before the July 10, 2021, completion of his alleged two-year employment contract, Higgins received income which he would not have received had he not been terminated by Tru Service. That income included $8,169.24 from DoorDash, $22,158.00 in unemployment compensation, and $46,800.00 from Eagle Management Group, for a total of $77,127.24. (ECF No. 103 ¶¶ 85, 87, 88.) Under

Wisconsin law, the $8,169.24 from DoorDash and the $22,158.00 in unemployment benefits are properly deducted from Higgins's claimed damages of backpay wages owed under the breached contract. *See Baird*, 65 Wis. 2d at 401, 222 N.W.2d at 670; *Dehnart*, 21 Wis. 2d at 595-96, 124 N.W.2d at 671. Of the $46,800.00 Higgins received from Eagle Management between April 2021 and July 10, 2021, however, Higgins testified that $40,000.00 was a lump sum payment, which Eagle Management gave to all account executives, paid for by a PPP loan. (ECF No. 71-2 at 53:10-18.) Higgins testified that Eagle Management divvied out the $40,000 lump sum payments to account executives "so that [Eagle Management] didn't have … to pay [the PPP funds] back at the end of the year." (ECF No. 71-2 at 53:10-18.)

Given the unusual and uncertain nature of the $40,000 payment, and the possibility that the payment may have impacted Higgins's subsequent paychecks or bonuses during his time with Eagle Management, the court finds that whether the $40,000 lump sum payment should offset Higgins's possible damages recovery is a genuinely disputed fact and not an issue fit for resolution on summary judgment. However, Tru Service is entitled to a set-off of Higgins's salary from Eagle Management aside from the $40,000 lump sum payment against any recovery by Higgins on his breach of contract claim.

### 4.3.2. Damages Apart from Backpay

In addition to the $367,000 remaining on his alleged two-year employment agreement, Higgins seeks to recover damages for "out-of-pocket medical costs, $2,500 for out-of-pocket medical bills, the cost for dental insurance, and the cost of vision insurance" (ECF No. 103 at ¶ 90); "the difference between what he was making at Nth Degree ($200,000.00) before Defendant hired him and what he was making at Eagle Management Group ($60.000.00)" (ECF No. 103 at ¶ 91); and punitive damages (ECF No. 34 at 10).

Tru Service argues that Higgins cannot recover these damages as a matter of law. (ECF No. 70 at 8-9.) It points out that, while seeking to recover damages related to his out-of-pocket medical costs, medical bills, and the cost of vision and dental insurance, Higgins "has not provided any documentation or testimony to prove that he has sustained any alleged losses related to these alleged damages," nor has he provided any explanation for how he calculated, or plans to calculate, such damages. (ECF No. 70 at 8.)

Higgins admits that he has not provided any of this information to support these damages. (ECF No. 103 at ¶ 90.) And he did not respond to Tru Service's argument on these damages in his opposition brief. (ECF No. 89.)

"A party claiming damages … must, in addition to disclosing the calculation of such damages, make available the supporting documents for inspection and copying …." *Sauer v. Exelon Generation Co., LLC*, No. 10 C 3258, 2011 WL 3584780, at *9 (N.D. Ill. Aug. 15, 2011) (quoting Fed. R. Civ. P. 26(a)(1) advisory committee's note to 1993 amendment).

Case 2:21-cv-01021-WED   Filed 03/29/23   Page 26 of 30   Document 109

Because Higgins has failed to make the appropriate disclosures to support his alleged damages relating to his out-of-pocket medical costs, medical bills, and the cost of vision and dental insurance, he is barred from recovering such damages.

Tru Service also argues that Higgins cannot recover "the difference between what he was previously making at Nth Degree … and what he was making at Eagle Management" because "recovery under any such theory is admittedly based on his own 'speculation'" on whether he would have kept his job with Nth Degree through the COVID-19 pandemic. (ECF No. 70 at 9.) "[Higgins] does not have any personal knowledge of what happened at Nth Degree after he left, the impact of the pandemic on Nth Degree's finances, what shows were canceled for Nth Degree in 2020, or the impact of such cancelations on his pay at Nth Degree." (ECF No. 70 at 9.)

Higgins did not respond in his opposition brief to the argument that these damages are too speculative and, therefore, fail as a matter of law. (ECF No. 89.) In response to Tru Service's proposed finding of fact, however, Higgins points to his deposition testimony in which he professed his opinion that he would have retained his position with Nth Degree had he not accepted a position with Tru Service, even in light of COVID, because "the account executives all pretty much … retained their job[s]." (ECF No. 103 at ¶ 91 (citing ECF No. 71-2 at 236:7-19).)

Even if the court were to take as true Higgins's belief that he would have retained his position at Nth Degree had he not left for Tru Service, he would still not be able to

recover damages for the difference between his salary at Nth Degree and his salary at Eagle Management. Higgins's possible damages for his breach of contract claim are the difference between what he was making at Eagle Management and what remains on his two-year employment agreement with Tru Service. *See Kramer*, 2001 WI App 244, ¶ 12, 248 Wis. 2d at 340, 635 N.W.2d at 860 (citing *Wassenaar v. Panos*, 111 Wis. 2d 518, 534, 331 N.W.2d 357, 365 (1983)). If Higgins was to also recover the difference between what he was making at Eagle Management and what he would have made had he remained at Nth Degree, he would be recovering damages as if he continued to work at Nth Degree and Tru Service simultaneously. Wisconsin law does not allow for such double counting in an action for breach of contract. *Cf. id.* at ¶ 13, 248 Wis. 2d at 341-42, 635 N.W.2d at 861 (citing *Hanz Trucking, Inc.*, 29 Wis. 2d at 268, 138 N.W.2d at 246). Therefore, the court will grant Tru Service summary judgment on Higgins's request for damages relating to the difference between his salary at Nth Degree and Eagle Management.

Finally, Tru Service argues that Higgins cannot recover punitive damages because "punitive damages are not available for a simple breach of contract case." (ECF No. 70 at 9.) Higgins does not respond to this argument (ECF No. 89), nor is it clear whether he in fact is seeking punitive damages for his breach of contract claim. (ECF No. 34 at ¶¶ 61-66.) In any event, Tru Service is correct—under Wisconsin law, "punitive damages are not available as a remedy for breach of contract." *Schwigel v. Kohlmann*, 2005 WI App 44, ¶ 10, 280 Wis. 2d 193, 202, 694 N.W.2d 467, 471 (citing *Autumn Grove Joint Venture v.*

*Rachlin*, 138 Wis. 2d 273, 279, 405 N.W.2d 759, 762 (Wis. Ct. App. 1987)). As such, Higgins may not recover punitive damages against Tru Service on his breach of contract claim.

**5.     Conclusion**

Because the Offer Letter unambiguously guaranteed Higgins two years of employment, he was not an employee at will and Tru Service's motion for summary judgment on Higgins's breach of contract claim must be denied. But summary judgment is not appropriate for Higgins on his breach of contract claim because there are a genuine disputes of material fact concerning whether Tru Service had just cause to terminate him before his two-year employment contract expired. Therefore, Higgins's motion for summary judgment on his breach of contract claim must also be denied.

Tru Service, however, has demonstrated that it is entitled to summary judgment on a set-off of $37,127.24 against any recovery by Higgins on his breach of contract claim, as well as on Higgins's claim to damages for undocumented medical costs, dental and vision insurance, the difference between his salary with Nth Degree and his salary with Eagle Management, and punitive damages.

**IT IS THEREFORE ORDERED** that Higgins's motion for summary judgment (ECF No. 84) is **DENIED**.

**IT IS FURTHER ORDERED** that Tru Service's motion for summary judgment (ECF No. 69) is **DENIED IN PART** and **GRANTED IN PART**. It is denied with respect to Higgins's claim for breach of contract. It is granted with respect to its request for a set-

off of $37,127.24 against any recovery by Higgins on his breach of contract claim. It is further granted with respect to Higgins's claim to damages for undocumented medical costs, dental and vision insurance, the difference between his salary with Nth Degree and his salary with Eagle Management, and punitive damages.

**IT IS FURTHER ORDERED** that Higgins's motion for leave to amend his memorandum of law in opposition to Tru Service's motion for summary judgment and his additional statement of facts (ECF No. 106) is **DENIED** as moot.

Dated at Milwaukee, Wisconsin this 29th day of March, 2023.

WILLIAM E. DUFFIN
U.S. Magistrate Judge